Filed 6/23/22  P. v. Nichols CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

THE PEOPLE,

　　Plaintiff and Respondent,

　　v.

TOMMY JACKSON NICHOLS,

　　Defendant and Appellant.

F082672

(Super. Ct. No. 1038145)

**OPINION**

## THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Thomas D. Zeff, Judge.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]　　Before Poochigian, Acting P. J., Peña, J. and Snauffer, J.

# INTRODUCTION

A jury convicted petitioner Tommy Jackson Nichols of first degree murder (Pen. Code,[1] § 187, subd. (a), count 1).[2] (*People v. Nichols et al.* (June 29, 2010, F055572 [nonpub. opn.] (*Nichols I*).) As to count 1, the jury found true the special circumstance that petitioner committed the murder while engaged in the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)). The trial court sentenced petitioner on count 1 to a term of life without the possibility of parole. (*People v. Nichols* (Mar. 13, 2012, F061963 [nonpub. opn.] (*Nichols II*).)

In 2019, petitioner filed a petition for resentencing on his murder conviction pursuant to section 1170.95. The trial court summarily denied the petition finding petitioner was a major participant and acted with reckless indifference to human life in the underlying felony, a disqualifying factor under the amended law. (§§ 1170.95, subd. (a)(3), 189, subd. (e).)

On appeal, petitioner contends the trial court erred by failing to conclude petitioner had made a prima facie showing of entitlement of relief and not issuing an order to show cause. Petitioner further contends the trial court erred in engaging in premature judicial factfinding at the prima facie stage. Petitioner further contends our Supreme Court's holdings in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) substantively changed the legal meaning of "major participant" and "reckless indifference to human life" and therefore the jury's special circumstance finding should not exclude him from resentencing relief as a matter of law. Lastly, petitioner contends he should not be required to file a petition for writ of habeas corpus before challenging a jury's true finding on the special circumstance.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Petitioner was convicted of additional offenses and enhancements, as described below.

2.

We conclude the trial court erred in engaging in premature judicial factfinding at the prima facie stage. However, we conclude the error was harmless because the special circumstance finding establishes petitioner is ineligible for resentencing as a matter of law. Accordingly, we affirm the trial court's order denying resentencing relief pursuant to section 1170.95.

## FACTUAL AND PROCEDURAL BACKGROUND

We include a brief summary of the facts of this case taken from petitioner's first direct appeal.[3]

"*The Homicide and Investigation*

"In March 2002, Tatum and Jose 'JoJo' Ruiz lived with their two children, eight-year-old Roshyla and five-year-old Ezra, in a house on … a small cul-de-sac in Modesto. [Fn. omitted.] Ruiz was known to police as a member of the West Side Boyz, a Norteno gang. He was also known as one of the major distributors of base cocaine in west Modesto, and federal authorities planned to serve a search warrant on his residence within a matter of days. In the year or so before the events of this case, Ruiz regularly bought cocaine by the kilo, cooked the cocaine and turned it into rock form, and then sold the product mostly by the ounce. According to Tatum, Ruiz did not sell drugs from their residence or keep more than small amounts of cocaine there, although he sometimes prepared, cooked, or packaged the drugs at the house. During the time period, he sometimes had large sums of cash hidden in different parts of the house. There was a safe with an electronic lock in the master bedroom closet. Ruiz usually did not keep any money there, however; instead, he kept a … nine-millimeter semiautomatic pistol in the safe for protection.

"Phillip Collins and Ruiz had known each other since about the third grade and, at the time of Ruiz's death, were, according to Collins, 'pretty much best friends.' Tatum was acquainted with Collins and was aware that he and Ruiz were in the drug business together. Tatum felt Collins could potentially be a backstabber to Ruiz.

---

**3** We provide these facts from the direct appeal because they were cited by petitioner in his opening brief. However, we do not rely on these facts in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

"In July 2000, Collins, having twice sold crack cocaine to an undercover officer and informant, was given the option of getting eight to 10 years in prison or turning in his friend. He chose to turn in his friend and, to that end, signed a contract with the Modesto Police Department that was approved by the district attorney's office. Pursuant to the agreement, Collins was required to buy drugs from Ruiz, Ruiz's brother Javier Ruiz, and another individual in controlled settings, and to testify as needed, in return for which he would plead guilty to one count of selling drugs, and be sentenced to local time and three years' probation. He was required to obey all laws and make all court appearances, and to keep Modesto Police Sergeant Helton advised of his residence and whereabouts. Helton would contact Collins when a purchase was to be made, then tell him from whom to make the buy. Collins would then arrange the deal, buy the drugs, and give the drugs to the police. He was wired for sound during the transactions, and the police gave him money to make the purchases.

"Under the supervision of Helton and FBI Agent Tim Hammond, Collins made approximately 20 controlled buys from Ruiz or his associates. [Fn. omitted.] The quantities purchased ranged from an ounce to a quarter kilo. Helton considered Collins very reliable and one of the better informants with whom Helton had worked. Federal grand jury indictments were obtained in February 2002, and served in March, with the prosecution of Ruiz's associates concluding in late spring 2003, when they all pled guilty in federal court. [Fn. omitted.] According to Helton, Collins would not have been privy to the status of the investigation and would not have been told when arrests and indictments were imminent. He was not to receive any consideration for his participation in the case concerning the Ruiz homicide. Ultimately, Collins never pled guilty to anything or served time in jail, and was told he would not be prosecuted on his case. [Fn. omitted.]

"In 2002, Collins was acquainted with Trice (known to him as Roach), knew of [petitioner] (known as Bam or Bam Bam), and came into contact with Dean (known as J Dogg). Collins, who had suffered two felony convictions prior to 2002 and been sent to the California Rehabilitation Center (CRC) for one, had gotten to know Trice during the 13 months both were at CRC. During the time Collins was at CRC, Blood, Crip, and Sureno gang members were there. The Bloods wore red and the Crips wore blue. Trice, who was from the Pasadena Denver Lane Bloods (PDL) and had 'Pasadena' and 'DL' tattoos, mostly associated with those wearing red, and Collins saw him 'throw[]' a Blood sign with his hands. Bobby Blueford was also in CRC with Collins and Trice.

4.

"As CRC's inmates were all there for drug offenses, they sometimes bragged about the drug crimes they committed or the great connections they had. Collins did so with PDL members. He let Trice and Blueford know that if they were ever in his area, he had a good drug connection in Modesto. He probably told them that he had his main connection, and that the person was his Mexican partner. [Fn. omitted.] He also probably talked about the quality of the drugs the man had, that the man was able to get as much as they wanted or needed, and that he would sell it to Collins for a fair price. Collins was talking about Ruiz, but he did not believe he ever mentioned the name to any of the PDL members.

"While in CRC, Collins and Trice associated on a daily basis. After they got out of CRC, they ran into each other in Merced, where Trice had family. This was a couple of years before Ruiz was killed. Collins observed Trice making hand-to-hand drug sales. Whenever Trice was coming to Merced from Pasadena, he would give Collins a call and they would get together.

"The week before the weekend of Ruiz's murder, Trice called Collins at Collins's home in Atwater and said he was coming down for the weekend and would call when he got into town. Trice came by Collins's house sometime on Friday. Blueford, Dean, and [petitioner] were with him. They arrived in a silver … [c]ar. The car looked new, and one of them said it was a rental. After some general conversation, the topic turned to drugs. Collins mostly spoke with Trice, who wanted to know how and where to get a quarter kilo of rock cocaine. Trice asked Collins several times that day to hook him up with someone who had that much. [Fn. omitted.] Trice asked Collins if Collins could hook them up with Collins's 'Mexican homeboy,' the connection about whom Collins had talked while in CRC. Trice kept asking when they could go get it and how much it would cost. Collins knew that under the terms of his contract with the police department, the whole deal could be off if he broke the law or sold drugs, so he knew he could not set up the contact. He told Trice he would hook them ([the co-defendants, petitioner] and Blueford) up and to give him a call the next day or the day after, but he was just playing Trice. He was drinking at the time, however, and told [the co-defendants, petitioner] and Blueford that his connection had a lot of drugs stashed and a lot of money, and the kind and color of his car. [Fn. omitted.] Helton had contact with Collins late Friday morning; Collins said nothing about knowing of people who were trying to make buys from Ruiz, even though he was under an obligation to notify Helton anytime there was a possible sale of drugs involving Ruiz. Likewise, Collins did not contact Hammond, his federal handler, although he knew Hammond would be very interested.

5.

"Berenice S[.][4] lived on Hasley Drive, across the street from the Ruiz home. One or two days before Sunday, March 3, a black, lowered Chevrolet pickup truck drove slowly by and then stopped briefly on Hasley. Its two occupants looked at the Ruiz house. A little while later, another vehicle—a newer, possibly four-door, light-colored or grayish or white [car] with tinted windows—did the same thing, although this one stopped around the corner. [Fn. omitted.] This was odd, because usually someone turning into the cul-de-sac by mistake would just drive on around in a [u]-turn and go back out.

"On Saturday, Collins was at a wedding, but caller identification records on his phone showed that Trice called several times during the day. Collins called him back at least once and said he was busy that day and would call Trice back. Trice was calling too much, 'bugging' Collins about drug sales. Collins did not know whether Trice called on Sunday; it was Collins's daughter's birthday, and Collins was away from home all day.

"Around 8:00 p.m. on Sunday, March 3, Tatum, Roshyla, and Ezra had dinner. Ruiz, who had been receiving a lot of calls on his cell phone before he went out for a while, was not home, although Tatum telephoned him during dinner and asked him to bring something from the market. After the meal, the children went to the bathroom to take a bath. About 15 minutes after she had talked to Ruiz, Tatum was cleaning up in the kitchen when she heard the front door open and close. There was a moment of silence, then Tatum heard Ruiz call her name in an urgent tone of voice and tell her to get down. She turned to look and saw him on the ground between the entryway and the kitchen. Two people were holding him by the back of his shirt and pointing guns at him. One was Dean. Another person—Trice— came around the corner with a black revolver pointed at Tatum and told her to get down. [Petitioner] was the third person she saw. He was holding a black gun that was the biggest of the guns she saw. He pointed it at Ruiz.

"Tatum got down on the floor, but was still looking at the intruders. She and Ruiz both started begging them not to let the children see what was happening. One or more of the intruders were telling them to put their heads down and not look at them. Tatum was still looking at Trice, and he told her, ' "Bit**, put your head down." ' When she objected to him calling her a bit**, he said it again and jabbed the gun toward her eye and told her again to put her head down. At some point during this time, one or

---

**4**     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

6.

more of the intruders said something to the effect that they just wanted the stash.  Tatum interpreted this to mean they wanted money or drugs.

"Dean told Trice to take Tatum to find the children.  Trice walked her out of the kitchen and through the dining room.  For reasons unknown to her, there was a pause, during which she stood in the dining area, between the dining and the living room area, for a moment.  She saw someone walking down the stairs from the entryway.  [Fn. omitted.]  Another person was standing in the dining area.  At this point, she believed there were four intruders, total, in the house.  [Fn. omitted.]  One or two were wearing a black beanie or cap with a red emblem on it.  The hair that was not covered was either curls or braids.  The other two were bare-headed and their hair was also either in braids or curls.  Dean had the longest hair.

"Up until this point, Trice had been watching over Tatum.  At some point, there was a transition in who was watching her.  She thought it might have occurred during the pause, but was not certain.  Tatum believed Trice then went toward Ruiz, but she did not see what he did.  At some point, she saw [petitioner] direct the gun at Ruiz.

"Meanwhile, the children had disrobed but, before they could bathe, Ezra told Roshyla that their father's friends were there.  Roshyla went to see who they were.  She saw around three African-American men coming through the door.  The intruders were wearing black clothing and some were wearing beanies.  One of the men had black hair done in shoulder-length braids.  His face was skinny or bony, his nose was long and pointy, and his teeth protruded from his mouth.  Roshyla subsequently identified this man, through a photographic lineup and at trial, as Dean.

"Roshyla went back into the bathroom.  She and Ezra were about to get into the bathtub when Dean entered the bedroom.  He did not say or do anything, but went back out and then returned with Tatum.  He had a gun to the back of Tatum's head and was holding one or both of her arms behind her back.  He told her to get clothes for the children, so she and he left the room and returned with clothing that had been in the laundry room.  Tatum, who was acting rushed, got the children dressed.

"According to Tatum, the man who was with her at this time—Dean—was the person who was in charge of her after the transition.  He was with her the entire time she was in the bathroom.  At one point, he took his eyes off her and started looking around the bedroom.  There was some jewelry on a dresser on the other side of the room, and he walked toward it.  [Fn. omitted.]  Tatum's purse was on the bed.  Thinking it contained her cell phone, she went to grab it, but Dean saw her, pointed the gun at her, and

7.

told her to put the purse down. She threw the purse back onto the bed. She later discovered that her cell phone was missing. She could not recall if she recovered it.

"Around this time, Trice and [petitioner], who was wearing a light blue shirt, forced Ruiz to walk through the bedroom to the walk-in closet. Both had guns. The closet door opened inward into the closet; the safe was behind the door. The closet door was half open, and Tatum could see the back of [petitioner]'s light blue shirt. She then heard gunshots, probably at least three initially. She started screaming, ' "No," ' and saw Dean go to the closet door and start shooting inside the closet at a downward angle. He fired a few shots, then paused. Tatum witnessed at least four shots going into the closet door. There were other shots still going off behind the door. She was screaming and crying and wanting to save the children, so she ran to the bathroom, opened the window and broke off the screen, then boosted Roshyla up so she could climb out the window, and told her to run to the neighbor's house and tell them to call 911. Tatum then tried to pick Ezra up and put him through the window, but he was screaming and so scared that he would not let her push him out. She told him to stay where he was, and by this time, the gunshots had stopped. Tatum believed she heard between five and 10 shots.

"Meanwhile, as Roshyla was running to the neighbor's house, she saw two of the intruders trying to leave by going over the chain-link fence next to the Ruiz house. One said to the other—Dean—that they had to get out of there, then he said a name that started with either R-A or R-O. Another intruder ran out of the garage, and Ruiz crawled out of the house like he was chasing the man. Roshyla did not stop to look at him, but kept running to the neighbor's house across the street. When the woman answered the door, Roshyla said she thought her dad got shot, and then they called the police.

"After the gunshots stopped, Tatum walked into the bedroom and did not see anyone. She then walked to the closet, but did not see anyone there, either. There was blood everywhere, however, and Ruiz's gun was on the closet floor. Although it appeared to have malfunctioned, she grabbed it anyway and followed the blood trail through the bedroom, down the hallway, and into the garage. She saw Ruiz on his hands and knees and ran out to him. He was spitting out blood and gasping for air. Tatum was screaming and told him to hang on, then ran back inside to get Ezra and a phone. She was talking to the 911 operator when she got back to Ruiz, and when she saw he was already lying still, she threw down the phone and rolled him onto his back. When a neighbor ran over to see what had

happened, Tatum screamed that Ruiz had been shot. She then began performing CPR.

"Modesto police were dispatched to the Ruiz residence at approximately 8:14 p.m. They arrived within minutes to find Ruiz down in the driveway, with a … nine-millimeter semiautomatic handgun lying next to him. The gun, which had a 15-round magazine in it, appeared to have malfunctioned, as the slide was partially back and a round was sticking out of the ejection port. [Fn. omitted.] Tatum was performing CPR on Ruiz, who had been shot and was bleeding profusely. Blood was trailing from him down the driveway, and it appeared that someone had made tracks through it. There was an odor of freshly burnt gunpowder in the house.

"Modesto Police Officer Garcia spoke to Tatum at the scene. She described one of the perpetrators (none of whom she could identify by name) as a Black male adult in his mid- to late 20's, five feet seven inches and 170 pounds, and wearing a black beanie cap with hair sticking out of it. She said he was light-skinned and had a rough complexion, and horse teeth with big lips. He was wearing a black shirt or sweatshirt. She said this person shot into the closet door. She described a second perpetrator as a Black male adult in his early 30's, five feet eight inches tall and 230 pounds, with black hair in Jeri curls or braids, possibly collar-length. He was light-skinned and had a chubby, round face, and was wearing a blue jersey and possibly blue jeans. She said he walked into the dining room when the suspects came into the home. Tatum described the third perpetrator as a Black male adult in his mid- to late 20's, five feet nine inches tall and approximately 170 pounds, with short black hair and dark skin. She said he was wearing a black sweatshirt and was armed with a handgun, and that he pointed a gun in her face in the kitchen. The fourth perpetrator was a Black male adult in his late 20's or early 30's. Tatum had no further description of him. She informed Garcia that after she put Roshyla out the bathroom window, she saw the man who shot into the closet walk northbound past that window. [Fn. omitted.]

"Police searched the area in and around the Ruiz home shortly after the shooting. Entry to the house did not appear to have been forced; the front door was partially open and a set of keys was in the lock. In the hallway that led from the garage into the house and ultimately to the master bedroom, officers found two aluminum-colored … .380-caliber shell casings, bloodstains, and bloody handprints on the carpet. Inside the master bedroom itself were three more of the expended .380 shell casings. There were also bullet holes in various places in the room, and several expended copper-jacketed bullets were recovered. From the four bullet holes in the

9.

door of the master bedroom closet and associated gunshot residue, it was possible to ascertain that those shots were fired from the outside of the closet door inward. All four were fired in a downward, almost 45-degree angle. In the closet was an expended nine-millimeter shell casing that was believed to have been associated with the gun found by Ruiz's body. Also in the closet was a small safe with an electronic lock. The door was open and some of the contents were spilled out onto the floor. The trajectory of the bullets shot through the closet door was toward the general area of the safe. There were bloodstains in various places in the room. There was also blood in the closet, although not a lot. Bloodstain samples taken from the master bedroom were Ruiz's blood. The blood evidence essentially traveled a path from the master bedroom closet, through the area of the foot of the bed, down the hallway, to the garage, and to where Ruiz's body was located. Two dressers in the room contained cash in the amounts of $8,083 and $8,400. A box of .40-caliber ammunition was found in the master bedroom. It was the only box of ammunition found in the house. The box, which should have contained fifty .40-caliber rounds, contained forty-nine .40-caliber cartridges and one 9-millimeter round.

"On the living room floor was a red-and-black knit cap with 'California' embroidered on the front. It seemed out of place, since the rest of the house was fairly neat. On the floor of the dining room were a Nokia cell phone in its holder and four plastic zip ties that also seemed out of place.

"The screen on the window of the master bedroom's bathroom was partially torn. Three shampoo bottles were on the ground underneath the window. A trail of items that appeared to have been taken from the house led to a hole that had recently been cut in the chain-link fence on the property line. Additional items and footprints led in a northerly direction. In a field directly north of the Ruiz residence, close to Woodland Avenue, officers located a black … .22-caliber nine-shot rimfire revolver. At trial, Tatum identified this gun as looking similar to the one Trice pointed at her. Ruiz's blood was on the gun's cylinder. Footprint impressions in the grass and weeds indicated someone had recently run across the corner of the property. The direction of the footprints was northwest, toward Bennett Lane. A black-colored … .357 Magnum revolver containing six expended shell casings was found underneath a bush in the front yard of a house on Bennett. The lack of condensation, cobwebs, and dust on the gun indicated it had not been there long. At trial, Tatum identified this gun as looking like the one the fourth intruder (who was not present at trial) had. The trail of evidence was consistent with a getaway car being parked about a block from the Ruiz house.

10.

"Detective Brocchini went to the crime scene on the night of the shooting and spoke to Andre R[.] Andre … related that a neighbor said he heard the shooting, then saw an older Black male adult with a short Afro haircut, in an orange, primered minivan, begin to honk his horn. The neighbor said he then saw two Black subjects run from the area around the Ruiz residence to the minivan, and then the minivan drove off. The neighbor also mentioned something about a black or new [car]. Brocchini's attempts to track down the person who actually made the statements were unsuccessful.

"Meanwhile, according to Collins, he returned home sometime after dark on Sunday. He and his wife were relaxing when they heard a bang on the door. [Petitioner] and Dean were there. [Petitioner] said something to the effect that Trice had been shot crossing the street across from the gas station near Collins's house. They said they had dropped him off down the street at some girl's house. Dean said they could not leave their homeboy and asked how to get to the freeway. Collins gave him directions. [Petitioner], the more aggressive of the two, told Collins that they knew where he lived, and that if anyone came by asking questions, Collins was to say Trice got shot crossing the street. Collins could see the handle of a pistol tucked in the front of [petitioner]'s pants. [Petitioner] and Dean were at Collins's house for about 10 to 20 minutes, then left. Collins could not tell whether anyone else was in their car. While they were there, Helton telephoned with the news that Ruiz had been shot.

"Helton telephoned Collins at about 9:00 p.m. He told Collins to call him if Collins heard anything. According to Helton, Collins called him back about 11:00 that night and said he had received several calls from people, advising him of Ruiz's death. Collins said nothing about anyone named Roach, Bam, or J Dogg. [Fn. omitted.]

"Just after 9:00 p.m. on March 3, Atwater Police Officer Ridenour responded to an address in Atwater in response to a report of a shooting. He came in contact with a person who identified himself as Keith (not Kevin) Trice, and who had gunshot wounds to his back and lower abdomen. [Fn. omitted.] Because there was no trauma center in Merced County, standard procedure was to airlift Trice to Modesto. When told this would happen, Trice immediately and adamantly responded that he did not want to go to Modesto. Medical personnel explained that there were no other options. Ridenour questioned Trice in the ambulance on the way to the airfield. Trice did not answer some of Ridenour's questions, although he did say that he did not know who shot him; that the person or persons were in a vehicle, but he did not know whether it was a car or a truck; and that he had been going to the store. Trice was similarly vague when

11.

questioned by a doctor at the hospital, adding little more than that he was from Los Angeles and had been down for three days, visiting a Sonjia in Atwater or Merced.  Atwater police were unable to find any witnesses to a shooting or any physical evidence that one had occurred in the area.

"Modesto Police Detectives Grogan and Blake interviewed Trice [at] about 1:40 p.m. on March 4.  Trice related that he had been in Atwater, visiting a friend named Sonjia G[.], and was walking from her house to a store to purchase some alcohol, when he was the victim of a drive-by shooting.  He said the car was dark and that he believed he was shot by someone sitting in the front passenger seat.  Trice said he was bleeding profusely, and it took him some time to gather the strength to walk back to the apartment.

"During the interview, Trice asked if he could use one of the detectives' phones to call his mother.  After the interview ended, Blake allowed him to use his cell phone.  Once he got connected, Trice said, 'Mom, I got shot yesterday in Modesto.'  This was said as one complete sentence, without any gaps, although Grogan could not hear what, if anything, Trice's mother said or asked.  [Fn. omitted.]  Grogan subsequently obtained items of evidence from the Atwater Police Department and Sonjia[]'s house, including an expired driver's license for Keith Lamont Trice (Trice's twin brother) and a pair of brown pants that had Trice's blood on them.  He measured the distance and travel time between the crime scene in Modesto and [Sonjia]'s residence in Atwater, and determined it was possible for Trice to have left the scene in Modesto and gone to the address in Atwater between the homicide and when he placed the call for assistance.

"Brocchini was assigned to research Trice.  After talking to Trice's girlfriend and family, Brocchini put together a list of associates who matched the description of the suspects.  He had photographic lineups made of those people, as well as Trice, and gave them to Detective Blake.  Upon learning from Blake that the names Brocchini gave him were not identified, Brocchini continued to investigate and came up with [petitioner] as a possible suspect.  He put together a photographic lineup of [petitioner] and gave it to Blake and Detective Owen.

"Brocchini telephoned Collins the morning after the shooting.  He was aware that Collins knew Ruiz and was working for Helton and the FBI.  He wanted to know if Collins knew Trice, since Collins lived in Atwater and Trice had been found there.  When Brocchini asked whether Collins knew Trice, to whom Brocchini referred by that name, Collins said no.  However, Collins contacted Helton later that morning and told him that he thought something was going on.  As a result, Helton and Hammond interviewed him that afternoon.  Collins provided descriptions of Bam, Roach, and

12.

J Dogg. He said they had told him they had $5,000 and wanted to buy a quarter kilo, and that they would give him $500 to set up the buy. He later identified pictures of [the co-defendants, petitioner] and Blueford from photographic lineups.

"Brocchini spoke to Tatum the afternoon after the shooting. When he asked if it was possible Ruiz had gone to meet somebody at the … minimart for the purpose of selling drugs, she said yes and agreed that whomever Ruiz spoke to in his last cell phone call could have had something to do with the incident. The caller log for Ruiz's cell phone showed that at 7:47 p.m. on the night of his death, he received a call from a cell phone associated with Dupree H[.], a Blood gang member who had been to prison. The last call Ruiz received, which was made at 7:59 p.m. that night, was from a cell phone associated with Thomas "Bird" W[.], another Blood member in Modesto, who dealt cocaine and had also been to prison. Brocchini asked around about their possible involvement; the only information he was able to obtain was that the last couple of phone calls to Ruiz were from phones associated with them.

"On March 5, Brocchini contacted a parole agent working for a fugitive task force in Los Angeles and directed him to find and arrest [petitioner]. [Petitioner] was arrested that day in Pasadena. A black beanie was seized in a search of his house. The next day, Brocchini contacted Officer Roldan of the Pasadena Police Department, who was known to him as an expert in the Black criminal street gangs of Pasadena, and asked for help in identifying J Dogg and B Dogg. Brocchini got these names from Collins, who said that Bam Bam, B Dogg, J Dogg, and Roach had come by. Roldan researched J Dogg, and obtained enough information through an anonymous telephone call to figure out who this person was. As a result, Dean's photograph was obtained. Roldan and Brocchini, who had gone to Pasadena on March 7, put together a photographic lineup and e-mailed it to Detective Blake in Modesto. Half an hour later, Blake informed Brocchini that Tatum and Roshyla had identified Dean as a suspect. As a result, Dean was arrested at his home.

"After Dean's arrest, Brocchini continued his search for the … [c]ar. Following receipt of a tip, he went to a … [car rental] place and learned that a car rented to Tricia L[.] was at a rental yard at the airport in Burbank. He went to the airport and saw what looked like blood in the car's back seat. Brocchini had the car impounded and processed for evidence. [Fn. omitted.] Trice's blood was in the back seat. [Petitioner]'s palm print was found on the driver's side hood. [Fn. omitted.]

13.

"Tricia [] rented the [car] on a Friday in February 2002, as her vehicle was scheduled to be serviced. Her plan was to rent the [car] for the weekend and return it on Monday. Trice was with her when she rented the car. [Tricia] ended up not taking her car to get serviced, and at some point on Friday, Trice asked to use the [rental car]. He was going to come back during the weekend. When [Tricia] got off work that Friday, she went to Trice's mother's house in Altadena. The car was still there. Trice had her permission to use it Saturday. The next day, [Tricia] attended a birthday party for Trice's nephew. She expected to see Trice there at some point, but did not. She unsuccessfully tried to page him during the weekend to remind him that the car needed to be back on Monday. On Monday morning, she received a call from Blueford, saying he had the rental car and so she could take it back and return it. She asked where Trice was, but he said he did not know.

"On March 14, Brocchini listened to some telephone calls at the Stanislaus County jail. In one, Dean told his mother and sister to contact a lady he identified as JP's sister, and for whom he gave a telephone number. He wanted his mother and sister to make sure the lady said that Dean was dropped off at her house on Friday and was not picked up until after the weekend. As a result of information contained in the call, Brocchini contacted Lisa Y[.]

"[Lisa] testified that Dean telephoned her on the Friday of the weekend of the homicide. Dean said he was in Modesto and wanted to visit her. She explained that she was going to be going out of town and would not be back until Sunday. At the time, [Lisa] lived in Fresno. Dean had visited her before and had brought Trice with him. She did not see Dean on the weekend of the homicide. Later, after [Lisa] had spoken to Brocchini and declined to say whether Dean had been with her, Dean's sister telephoned [Lisa] and said there was a message from Dean that he wanted [Lisa] to say he was with her that weekend.

"On November 24, 2002, Herbert B[.], who lived on Walker Avenue approximately half a mile north of Woodland, reported finding a … .380 semiautomatic handgun underneath the empty engine compartment of a [car] that he was preparing to take to the junkyard. The [car] had been in a field next to [Herbert]'s house for months. The gun, which was rusted, had an empty clip in it and a live round in the chamber. At trial, Tatum identified this gun as being similar to the one Dean had.

"Ruiz was shot at least nine times and sustained five fatal wounds. Stippling indicated that at least two of the shots were fired from close range. Death resulted from shock and hemorrhage due to multiple gunshot

14.

wounds. Four .22-caliber bullets from rimfire cartridges were recovered from his body during the autopsy. Although there was insufficient individual detail to definitively identify them as having been fired from the same gun, test firing showed that they could have been fired from the … revolver recovered in this case. The nine-millimeter cartridge case found in the closet was fired by the … nine-millimeter pistol. That pistol would not shoot a .40-caliber bullet; as the bullet would be too big for the chamber, the gun would not load itself and would jam. A nine-millimeter and .40-caliber cartridge are readily distinguishable because of their different diameters and weights. The condition of the … .380-caliber semiautomatic pistol was consistent with it being outside in a field for six to eight months or more, and the chamber and barrel were very corroded. The pistol was rusted shut, and a … live round had to be forcibly removed from the chamber. This unfired round was the same caliber, and from the same manufacturer, as an expended cartridge from the homicide scene that was submitted for comparison, but results were inconclusive as to whether the expended cartridge had been fired from the [.380-caliber pistol]." (*Nichols I*, *supra*, F055572.)

The Stanislaus County District Attorney filed a consolidated amended information charging petitioner with premediated first degree murder (§§ 187, subd. (a), 189, count 1) with the special circumstances that petitioner intentionally committed the murder while an active participant in a criminal street gang, that the murder was carried out to further the activities of the gang (§ 190.2, subd. (a)(22)) and that the murder was committed during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)); kidnapping (§ 207, subd. (a), count 2); two counts of first degree residential robbery (§ 212.5, counts 3 & 4); and two counts of felony false imprisonment (§ 236, counts 5 & 6). All six counts included multiple firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d), & (e)(1)) and a gang enhancement (§ 186.22, subd. (b)(1)). It was also alleged petitioner suffered two prior serious felony convictions that were also strikes (§§ 667, subds. (a)(1), (b)–(i), 1170.12, subds. (a)–(d)) and that he served three prior prison terms (§ 667.5, subd. (b)). (*Nichols I*, *supra*, F055572.)

Subsequently, a jury convicted petitioner of first degree murder (count 1), two counts of first degree residential robbery (counts 3 & 4), two counts of felony false

15.

imprisonment (counts 5 & 6) and found true the robbery special circumstance, along with the firearm and gang enhancements.[5] In a bifurcated court trial, the trial court found true that petitioner had suffered two prior serious felony convictions that were also strikes and found true the prior prison term allegations.[6] (*Nichols II*, *supra*, F061963.)

Petitioner then filed a motion for a new trial. After conducting an evidentiary hearing, the trial court struck all gang enhancements, but otherwise denied the motion. Petitioner was then sentenced on count 1 to a term of life in prison without the possibility of parole, plus a consecutive term of 25 years to life for the firearm enhancement, and a consecutive 10-year term for the prior serious felony convictions. The trial court stayed the sentence on count 3 pursuant to section 654. As to count 4, the trial court imposed a concurrent term of 25 years to life with an additional term of 25 years to life for the firearm enhancement. As to count 5, the trial court imposed an additional concurrent term of 25 years to life with a term of one year, four months for the firearm enhancement. As to count 6, the trial court imposed an additional concurrent term of 25 years to life with a term of one year, four months for the firearm enhancement. (*Nichols II*, *supra*, F061963.)

In petitioner's first direct appeal, this court reversed the section 12022.53, subdivision (c) and (d) enhancements, as to counts 1, 3, and 4, for insufficiency of the evidence, and ordered that sentence be imposed on the section 12022.53, subdivision (b) enhancements that were alleged and found true as to those same counts. This court also

---

[5] During the jury trial, the People dismissed count 2, as well as the premeditation allegation and street gang special circumstance as alleged in count 1. (*Nichols I*, *supra*, F055572.)

[6] Section 1171.1, subdivision (a) states "[a]ny sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of [s]ection 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense … is legally invalid." Petitioner did not raise the applicability of this provision to his sentence in the trial court, and we will not address this issue in the opinion. However, petitioner retains any remedies to address this in the future.

struck a restitution order to the City of Modesto. This court otherwise affirmed petitioner's convictions, but vacated the sentence and directed the trial court to sentence petitioner in accordance with the views expressed in the opinion. (*Nichols I*, *supra*, F055572.)

In 2012, petitioner filed a second direct appeal following his resentencing. This court struck a parole revocation restitution fine and affirmed the judgment as so modified. This court also directed the trial court to prepare an amended abstract of judgment that (1) deleted the restitution order to the City of Modesto; (2) deleted the parole revocation restitution fine (§1202.45); (3) reflected petitioner's receipt of 3,269 actual days of custody credit; and (4) reflected the imposition of a 10-year term for the firearm enhancement as to count 4. (*Nichols II*, *supra*, F061963.)

On March 19, 2019, petitioner, in propria persona, filed a petition for resentencing on his murder conviction pursuant to section 1170.95. In the form petition, petitioner stated a complaint, information, or indictment was filed against him that allowed him to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder at trial; and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. Petitioner also requested the court appoint counsel during the resentencing process. Petitioner further stated he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree; or that he was not a major participant in the felony or did not act with reckless indifference to human life during the course of the crime or felony. Lastly, petitioner stated the murder victim was not a peace officer acting in the performance of his or her duties.

On May 16, 2019, the People filed a response and motion to dismiss the petition on the grounds (1) petitioner failed to make a prima facie case; (2) the doctrine of

17.

collateral estoppel bars petitioner from challenging his conviction; and (3) Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) is unconstitutional on various grounds.

The trial court appointed the Public Defender's office to represent petitioner. Subsequently, the Public Defender's office declared a conflict and new counsel was appointed.

On December 18, 2020, the People filed a supplemental response to the petition for resentencing arguing that petitioner cannot make a prima facie showing of entitlement to relief because he could still be convicted of first degree murder under the amended law either as the actual killer, a direct aider and abettor to the murder, or as a major participant who acted with reckless indifference to human life. On February 22, 2021, petitioner filed a brief in support of section 1170.95 resentencing arguing that he has made a prima facie showing because there is no evidence that he was an aider and abettor to the murder *or* that he acted with reckless indifference to human life.

On March 11, 2021, the trial court summarily denied the petition at the prima facie stage finding that petitioner was a major participant and acted with reckless indifference to human life thereby disqualifying him from resentencing relief. Specifically, the trial court stated:

> "In deciding whether [petitioner] was a major participant in a special circumstance felony murder, the [c]ourt must consider the following factors:
>
> "(1) what role the [petitioner] had in planning the criminal enterprise that led to one or more deaths,
>
> "(2) what role the [petitioner] had in supplying or using lethal weapons,
>
> "(3) what awareness the [petitioner] had of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants,

"(4) whether the [petitioner] was present at the scene of the killing, in a position to facilitate or prevent the actual murder, and

"(5) whether his or her own actions or inaction played a particular role in the death, and what the [petitioner] did after lethal force was used; no one of these considerations is necessary, nor is any one of them necessarily sufficient. [*In re Bennet* (2018) 26 Cal.App.5th 1002; *Banks*, *supra*, 61 Cal.4th at p. 788.]

"Here, [petitioner] planned the robbery with his co-defendants. [Citation omitted.] [Petitioner] showed up to the victim's house with a firearm with other individuals with firearms and was in the closet as the victim was being shot at. [Citation omitted.] A reasonable inference can be made that [petitioner] was aware of the dangers of having a weapon and going into someone's home. [Petitioner] was present at the scene of the killing. Although it was never determined who fired the fatal shots, there is no evidence in the record that [petitioner] attempted to render aid to the victim or call an ambulance to render aid.

"Based on the above facts, [petitioner] was a 'major participant' as he was one of the people who entered the home with a firearm and was also in the closet with the other individuals as the victim was being shot at and murdered. Moreover, there is no evidence that [petitioner] attempted to prevent the murder.

"Therefore, [petitioner] is not eligible for resentencing as he was a 'major participant' in the crime. [¶] … [¶]

"[Petitioner] also demonstrated a reckless indifference with regard to human life in the commission of the crime. *Tison v. Arizona* (1987) 481 U.S. 137 provides some guidance here:

" 'Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.'

"[Petitioner] planned and executed (along with others) a robbery that involved the use of a firearm, taking a hostage (the victim was 'escorted' into his own home at gunpoint by the [petitioner] and his co-defendants), and putting the victim in a closet with multiple armed individuals. These actions carried a 'grave risk of death' and demonstrate [petitioner]'s reckless indifference toward human life. [Petitioner]'s possession of the

19.

possible murder weapon and his failure to render aid to the victim of the crime further supports the Court's conclusion that [petitioner] acted with reckless indifference.

[¶] … [¶]

"[Petitioner] is not eligible for resentencing as he acted with reckless indifference to human life and was a 'major participant' in the crime."

On April 14, 2021 petitioner filed a timely appeal.

## DISCUSSION

### I. Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill 1437 "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless

indifference to human life, as described in subdivision (d) of [s]ection 190.2."**7** (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill added section 1170.95 to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, at p. 843.) This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter …." (§ 1170.95, subd. (a).)

"Section 1170.95 lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.) First, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]

> "(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]

> "(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)–(3); see also § 1170.95, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

---

**7** Additionally, section 189 was amended to allow for felony murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (§ 1170.95, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition. (§ 1170.95, subd. (b)(2).) Otherwise, counsel must be appointed, if requested. (§ 1170.95, subd. (b)(3).) The prosecutor must file a response and the petitioner may file a reply. The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961–963, 967.) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970–971.) The record of conviction includes, but is not limited to, jury instructions and verdict forms. (See generally *id*. at p. 972.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id*. at pp. 971–972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b)

of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1170.95, subd. (d)(3).)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II. Analysis

On appeal, petitioner contends the trial court erred by failing to conclude petitioner had made a prima facie showing of entitlement of relief and not issuing an order to show cause. Petitioner further contends the trial court erred in engaging in premature judicial factfinding at the prima facie stage. Petitioner further contends our Supreme Court's holdings in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 substantively changed the legal meaning "major participant" and "reckless indifference to human life" and therefore the jury's special circumstance finding should not exclude him from resentencing relief as a matter of law. Lastly, petitioner contends he should not be required to file a petition for writ of habeas corpus before challenging a jury's true finding on the special circumstance.

We conclude the trial court erred in engaging in premature judicial factfinding at the prima facie stage. However, we conclude the error was harmless because the special circumstance finding establishes petitioner is ineligible for resentencing as a matter of law. Accordingly, we affirm the trial court's order denying resentencing relief pursuant to section 1170.95.

## A. The Trial Court Engaged in Premature Judicial Factfinding at the Prima Facie Stage

Petitioner contends the trial court erred in engaging in premature judicial factfinding at the prima facie stage. The People concede error. We accept the People's concession.

As noted above, our Supreme Court has articulated that at the prima facie stage, the trial court's inquiry is limited, and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, *supra*, 11 Cal.5th at pp. 971–972.) Here, it is clear the trial court engaged in premature judicial factfinding in concluding petitioner was a major participant and acted with reckless indifference to human life. Specifically, the trial court concluded petitioner was a "major participant" in the underlying crime by stating the following:

> "Here, [petitioner] planned the robbery with his co-defendants. [Citation omitted.] [Petitioner] showed up to the victim's house with a firearm with other individuals with firearms and was in the closet as the victim was being shot at. [Citation omitted.] A reasonable inference can be made that [petitioner] was aware of the dangers of having a weapon and going into someone's home. [Petitioner] was present at the scene of the killing. Although it was never determined who fired the fatal shots, there is no evidence in the record that [petitioner] attempted to render aid to the victim or call an ambulance to render aid."

Moreover, the trial court concluded petitioner "acted with reckless indifference to human life" by stating:

> "[Petitioner] planned and executed (along with others) a robbery that involved the use of a firearm, taking a hostage (the victim was 'escorted' into his own home at gunpoint by the [petitioner] and his co-defendants), and putting the victim in a closet with multiple armed individuals. These actions carried a 'grave risk of death' and demonstrate [petitioner]'s reckless indifference toward human life. [Petitioner]'s possession of the possible murder weapon and his failure to render aid to the victim of the crime further supports the Court's conclusion that [petitioner] acted with reckless indifference."

24.

The trial court's role at the prima facie stage is limited to rendering legal conclusions to determine whether a petitioner is ineligible for resentencing relief *as a matter of law*. (See *Lewis*, *supra*, 11 Cal.5th at p. 966.) Here, the trial court went beyond this limited role by acting as a factfinder in analyzing the specific facts of this case before concluding petitioner was ineligible for resentencing relief. (See *id*. at pp. 971–972.) Accordingly, the trial court erred.

**B.     The Error Was Harmless Because Petitioner is Ineligible for Resentencing as a Matter of Law**

As stated above, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent the error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

### i.     The Special Circumstance Finding is Dispositive

To be eligible for relief pursuant to section 1170.95, petitioner must not have been the actual killer, must not have acted with the intent to kill or malice aforethought, and must not have been a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.) Here, as to the murder charge, the jury found true the robbery special circumstance. (*Nichols II*, *supra*, F061963.) Relevant here, this special circumstance applies when a petitioner acts "with reckless indifference to human life and as a major participant" in aiding and abetting the commission of an enumerated felony. (§ 190.2, subd. (d); *People v. Gutierrrez-Salazar* (2019) 38 Cal.App.5th 411, 419.) In other words, "[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony[]murder statutes." (*Ibid*.) The jury found true that petitioner acted "with reckless indifference to human life and as a major participant" in

aiding and abetting the commission of the robbery.  Therefore, the special circumstance finding establishes the jury made the findings necessary to sustain the murder conviction under the law, as amended by Senate Bill 1437.  Petitioner is unable to establish the court's erroneous factfinding prejudiced his case because he is ineligible for resentencing relief as a matter of law.

Nonetheless, petitioner contends our Supreme Court's holdings in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 substantively changed the legal meaning of "major participant" and "reckless indifference to human life" and therefore the prior special circumstance finding should not exclude him from resentencing relief.  We disagree.  "*Banks* and *Clark* 'clarified "what it means for an aiding and abetting defendant to be a 'major participant' in a crime who acted with a 'reckless indifference to human life.' " ' [Citation.]  *Banks* identified certain factors to consider in determining whether a defendant was a major participant; *Clark* identified factors to guide the determination of whether the defendant acted with reckless indifference to human life." (*People v. Gomez* (2020) 52 Cal.App.5th 1, 13, fn. 5., review granted Oct. 14, 2020, S264033.)  Courts of Appeal are split on the question of whether a special circumstance finding entered prior to *Banks* and *Clark* renders a petitioner ineligible for section 1170.95 resentencing relief as a matter of law (see *People v. Jones* (2020) 56 Cal.App.5th 474, 478–479 [collecting cases], review granted Jan. 27, 2021, S265854), and our Supreme Court has granted review to decide the issue (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606).

This court has concluded that a special circumstance finding entered prior to *Banks* and *Clark* precludes relief as a matter of law.  (*People v. Simmons* (2021) 65 Cal.App.5th 739, 748–749, review granted Sept. 1, 2021, S270048.)  In so doing, we held that *Banks* and *Clark* did not state a new rule of law but rather illuminated factors a fact finder might consider in determining whether a petitioner was a major contributor who acted with reckless indifference to human life.  (*Ibid*.)  Although we recognize review has

26.

been granted in *Simmons*, we see no reason to depart from our analysis and conclusions therein. The principles illuminated in *Banks* and *Clark* existed when the jury found true the robbery special circumstance and we have no basis to conclude the jury understood these terms differently at the time of petitioner's conviction. Accordingly, petitioner is unable to establish a prima facie showing he is entitled to resentencing relief because he is ineligible for resentencing relief as a matter of law.

Petitioner further contends that he should not be required to file a habeas petition in order to challenge a jury's special circumstance finding. We disagree. Section 1170.95 provides a mechanism for resentencing individuals whose convictions are no longer valid due to changes to sections 188 and 189. (§ 1170.95, subd. (a)(3).) It does not provide a mechanism for challenging a jury's prior factual findings. (*People v. Allison* (2020) 55 Cal.App.5th 449, 461.) "The purpose of section 1170.95 is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved." (*People v. Allison*, at p. 461.) This court has declined to utilize the section 1170.95 procedure to examine the record of conviction to determine whether a special circumstance finding was properly entered. (*People v. Simmons*, *supra*, 65 Cal.App.5th at p. 749, review granted.) Rather, this court has concluded that such findings are binding on the issues necessarily decided by the jury, unless the findings were invalidated on direct appeal or in a habeas proceeding. (*Ibid*.) Petitioner's special circumstance finding has not been invalidated on direct appeal or in habeas and therefore the finding establishes that petitioner is ineligible for resentencing as a matter of law.

## DISPOSITION

The order denying petitioner's section 1170.95 petition is affirmed.

27.